Filed 4/9/14  P. v. Limon CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | | |
|---|---|---|
| THE PEOPLE, | | |
| Plaintiff and Respondent, | | C070153 |
| v. | | (Super. Ct. No. 09F9306) |
| GREGORY MATTHEW LIMON, | | |
| Defendant and Appellant. | | |

After hearing evidence of gruesome and cruel injuries suffered by a seven-year-old boy, J., a jury convicted defendant Gregory Matthew Limon of felony child endangerment (Pen. Code, § 273a, subd. (a)),[1] being an accessory after the fact (§ 32), and resisting a peace officer (§ 148, subd. (a)(1)).  The trial court sentenced defendant to serve six years in state prison.

On appeal, defendant contends (1) there was insufficient evidence of corpus delicti for the child endangerment conviction, (2) he received ineffective assistance of counsel when his trial attorney argued that, if anything, he was guilty of misdemeanor child

---

[1]     Undesignated statutory references are to the Penal Code.

1

endangerment, and (3) his trial attorney was ineffective for failure to object to the admission of statements he gave in violation of his *Miranda* rights.**2**

We conclude the evidence established corpus delicti for the child endangerment conviction. Defendant did not receive constitutionally deficient representation because both grounds for which he complains were consistent with reasonable tactical decisions by defense counsel. Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL HISTORY

***Prosecution Evidence***

On December 11, 2009, Shasta County Sheriff's Deputies Nathanial Benton and Dave Peery were accompanied by Children and Family Services social worker Laurie Schaller when they conducted a welfare check on seven-year-old J. At approximately 2:00 p.m., they arrived at a mobile home located at Rhonda Road in Anderson. As the deputies approached the mobile home, they saw the door open about six inches before slamming shut almost immediately. Deputy Benton announced the sheriff's department was outside and requested that whoever was behind door come outside. After repeated requests, defendant stepped outside.

Deputy Benton explained they were conducting a welfare check on J. Defendant stated he knew J. but had not seen him in two weeks. Defendant added that the only person at the residence was his girlfriend, Y.G. Deputy Benton asked to enter the residence to check for J. because the deputy was acting on information the child had sustained serious bodily injury. Defendant refused, stating he was not the owner of the residence and could not grant permission to enter. They continued to talk, and eventually defendant allowed the deputies and social worker to enter. Deputy Peery stayed with defendant outside while Deputy Benton and social worker Schaller went inside.

---

**2**      See *Miranda v. Arizona* (1966) 384 U.S. 436.

2

J. was found lying on a pull-out mattress of a bunk bed. The mattress had only been pulled out 12 inches, and J. had to lie on his side to fit onto it. Within arm's reach of J. was a bottle of Pedialyte and a bottle of prescription medicine bearing defendant's name.

Deputy Benton noticed abrasions and bruising on J.'s face and he was having a very difficult time breathing. When J. attempted to speak, "[i]t sounded like he was constantly out of breath, in pain trying to talk." J. said he was hurt and in pain. When the deputy asked whether he could sit up, J. said that "he hurt too bad" to move at all. Deputy Benton noted J. had "the appearance of extreme pain on his face." The deputies called for medical assistance.

When paramedics arrived, they asked Deputy Benton to help hold J. as they cut away his clothing. Deputy Benton testified, "As they removed the victim's clothes, I saw numerous abrasions on his head. I saw bruising on his neck. Bruising was wrapped around his entire torso, almost black in color, completely. The victim's nipples appeared to have been burned almost completely away. I noticed further bruising and abrasions down the victim's arms and legs." As the paramedics carried J. out on a stretcher, he said: "This hurts too bad. I can't do this anymore." When asked what had happened to him, J. said he had hit himself a few days earlier. He was then loaded into an ambulance.

Deputy Benton asked defendant why he had lied about J. not being at the residence and how he could just leave J. lying in the bedroom in that condition. Defendant responded that he had not understood the deputies to need to talk to J. and J. was "fine."

3

Eventually, defendant's sister, Rachel Limon, arrived at the mobile home.[3] Upon seeing the officers, she told them: "I know you're going to take me to jail, so just take me."

Due to the nature of his injuries, J. was air-lifted from the local hospital to the regional trauma center, University of California at Davis Medical Center in Sacramento. Dr. Kevin Coulter, a pediatrician at the medical center, examined J. when he arrived and admitted him to the pediatric intensive care unit. J. was injured "throughout all parts, external and internal, to his body." He had abrasions on his head and "a cauliflower ear" that had a swollen abnormal configuration. Cauliflower ear is usually "a consequence of a direct blow to the earlobe." J. had bruising on his neck and a missing tooth. The missing tooth was located in the back of his throat when x-rays were taken. J. had apparently swallowed the tooth. Dr. Coulter opined the tooth had been knocked out by a blow to the mouth.

J. had 13 broken ribs –- 7 fractured ribs on his right side and 6 on his left side. He had ribs that were not only cracked, but completely broken off. This trauma was consistent with blunt-force trauma having sufficient force to break the ribs off. Dr. Coulter noted this would usually involve "a high-kinetic energy event" such as "major accidents, motor vehicle accidents, severe falls, crushing injuries, very high-energy events." The rib injuries were one to two weeks old. Due to these injuries, blood was filling the surface of J.'s lungs and causing further injury. J. needed a blood transfusion in the emergency room. Without treatment, the rib and lung injuries could have been fatal. Dr. Coulter noted, "The severity of his fractures was extraordinary. The pain would have been severe. It would have been painful to do pretty much anything. Any kind of movement of his chest would hurt."

---

[3] Due to shared surname with defendant and for the sake of clarity, we refer to his sister by her first name.

4

The nipples on J.'s chest had recently been burned. J. also had linear abrasions and bruises on his chest, back, and abdomen. These injuries "looked like he had been struck with a belt-type instrument."

J. had fractured backbones, the type of injury typically caused by blunt-force trauma. Bones in both of J.'s arms and hands were fractured. At least one of these injuries "had been there for some time." The broken fingers raised "concerns for inflicted injuries."

J.'s liver and spleen had been lacerated in a manner consistent with blunt-force trauma. His genitals and surrounding area were bruised.

Dr. Coulter concluded, "[T]his child suffered severe blunt-force trauma. In my opinion these are inflicted injuries." J. could not have inflicted his injuries upon himself. Instead, "[s]omebody hit him with extreme force." Dr. Coulter opined that "if someone was carefully –- was watching him and looking at him, [a person] would recognize that it was hurting him to even take a breath and that breathing was becoming difficult." J. was far too injured to run, play, or "act like a normal 7-year-old child."

Later on the day J. was taken to the hospital, defendant was interviewed by Detective Eric Magrini at the sheriff's department. A video recording of the interview was shown to the jury and a transcript was provided. The interview began with defendant being advised he was not under arrest and was free to leave. Defendant stated his sister, Rachel, had called him earlier in the day and asked him to take care of J. while she took care of errands. Defendant and his girlfriend took J. with them while they went to look for a new apartment in which to live. J. did not complain of any pain and walked with them as they viewed approximately eight apartments. When they got back, J. got himself something to eat and watched a movie. Defendant denied seeing any injuries on J. because the child was wearing a long-sleeve shirt and beanie hat.

Based on inconsistencies in his story, defendant was informed he was being detained and read his *Miranda* rights. When asked if he wanted to keep talking,

5

defendant responded: "Just keep silent." The detective told defendant J. was in dire condition and asked how the injuries were inflicted. Defendant denied knowing anything about how the injuries were caused. After being told Rachel was "confessing to a lot of this," defendant admitted he had seen J.'s face had "[j]ust a bunch of scratches and shit and that's it." But defendant said he "didn't pay attention to that." Defendant stated the penicillin bottle found near J. had been prescribed for defendant when he had his tooth pulled.

Detective Brian Jackson joined the interview and told defendant they knew Rachel had been hitting J. Defendant denied ever seeing Rachel hit J. and stated, "Think that, I'll just keep my mouth shut then." The detective continued to talk about J., and defendant eventually admitted seeing Rachel once hit J. in the head and throw him onto the ground. Defendant saw J.'s face "was a little bit fucked up. And that's it." The whole episode made defendant uncomfortable and he left.

### *Defense Evidence*

The defense called J.'s first-grade teacher, who testified J. was part of her class during the 2008 to 2009 school year. Although she observed J. had a black eye at one point, she made no report even though she was a mandated reporter.

L.G., the sister of defendant's girlfriend, testified that in December 2009 she called Child and Family Services to report her concern for J. She did not believe Rachel's assurances J. "was doing fine and everything" because the boy appeared to be bruised on the cheek.

Defendant's mother testified she owned the mobile home on Rhonda Road where J. was found. Rachel was living at the mobile home in December 2009. Defendant lived there as well "off and on over a period of years."

6

# DISCUSSION

## I

### *Corpus Delicti for the Child Endangerment Conviction*

The corpus delicti rule requires the prosecution to prove the commission of a crime without relying solely on the defendant's extrajudicial admissions. (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168–1169 (*Alvarez*).) The rule is intended to ensure one will not be falsely convicted, by his or her untested words alone, of a crime that never happened. (*Ibid.*) Here, defendant contends no evidence –- aside from his admissions to the deputies –- was introduced at trial to establish the corpus delicti for child endangerment. The contention has no merit.

The Attorney General asserts the issue has not been preserved for appeal because defendant did not object in the trial court to the lack of evidence of corpus delicti. In arguing the issue, defendant acknowledges he did not object in the trial court on this ground. However, defendant relies on *Alvarez*, *supra*, 27 Cal.4th 1161, to contend an objection at trial is not necessary to preserve the issue. While *Alvarez* noted a split of authority on whether a prior objection is necessary to preserve the issue, the Supreme Court declined to resolve the conflict. (*Id.* at p. 1172, fn. 8.) We also need not resolve the issue because the evidence of corpus delicti was ample and uncontradicted.

Dr. Coulter's testimony supplied the necessary corpus delicti when he testified J.'s injuries could not have been self-inflicted but were caused when "[s]omebody hit him with extreme force." Moreover, Dr. Coulter's testimony established J.'s condition rendered someone grossly negligent in allowing him to languish without obviously needed medical attention. The corpus delicti rule requires no more than proof of " 'the commission of a crime by *somebody*, i.e. "the fact of the injury, loss, or harm, and the existence of a criminal agency as its cause." ' (*Alvarez, supra*, 27 Cal.4th at p. 1168.)" (*People v. Miranda* (2008) 161 Cal.App.4th 98, 107, italics added.) No evidence contradicted Dr. Coulter's testimony.

7

Defense counsel admitted during closing arguments that defendant was guilty of misdemeanor child endangerment after he observed J.'s facial injuries but took no action. Nonetheless, defendant now asserts no evidence showed defendant was guilty of neglecting the duty of care for J. The contention misapprehends the function of the corpus delicti rule, which requires only that someone committed the charged offense. "That person need not be the accused; it could be anyone. For that reason, '[p]roof of the corpus delicti does not require identity of the perpetrators. It is not necessary that it connect the defendant with the commission of the crime although it may do so.' (*People v. Cullen* (1951) 37 Cal.2d 614, 624.)" (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1428, fn. omitted.) Accordingly, we reject defendant's corpus delicti challenge.

## II

### *Claim of Ineffective Assistance of Counsel During Closing Arguments*

Defendant next contends he received constitutionally deficient representation when his trial attorney argued he was guilty of no more than misdemeanor child endangerment. We disagree.

### A.

### *Defense Counsel Admission that Defendant Committed Misdemeanor Child Endangerment*

During closing arguments, defendant's trial attorney argued to the jury:

"What you have in the jury instructions is a description of misdemeanor child abuse. And that description, the information that [defendant] had at the time that he's conveying to the officer, that's misdemeanor child abuse. And he didn't want to get blamed for that. That's not the nicest thing. That is not an altruistic reason for any of his statements. But that is consistent; that is consistent with what he did. That is consistent with the evidence that you have aside from [defendant]; the evidence from the doctor, the evidence from Deputy Benton and [Deputy] Peery.

8

"And so when you're evaluating that critical analysis from the video as well as the evidence that you have, that is something that you have to consider. Because again, the jury instruction 224, circumstantial evidence, if there are two reasonable explanations, you must accept the one that points to innocence. You don't –- it's not a do I think this one is more likely, do I think this one is more likely. If there are two reasonable explanations –- and it is reasonable, it is not polite, it is not good, it is not morally upright, but it is reasonable to not want to be charged with child abuse that you didn't do. And it is reasonable for a person in [defendant]'s circumstances to believe that a slap to the head, the child falling to the ground, and the marks on the face did not indicate death or great bodily injury."

Defendant's trial attorney further argued for the misdemeanor child endangerment charge by stating: "And quite frankly, that is probably [the] one given the fact that [defendant] had seen Rachel hit the child before, that he did see marks on his face, and he called her stupid for her actions, you may very well find him guilty of that [misdemeanor] child abuse statute, that he had care and custody of the child that day and knew that there was something wrong; not that he knew death or great bodily injury were likely, [or] that they had a high possibility [as] the result."

**B.**

***The Right to Effective Assistance of Counsel***

A criminal defendant is entitled to the effective assistance of legal counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674].) However, we reverse a judgment for ineffective assistance of counsel only when a defendant demonstrates " '(1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant." (*People v. Riel* (2000) 22 Cal.4th 1153, 1175 (*Riel*).)

9

"It is not deficient performance for a criminal defendant's counsel to make a reasonable tactical choice. (E.g., *People v. Fairbank* (1997) 16 Cal.4th 1223, 1243; *People v. Jones* (1997) 15 Cal.4th 119, 182 (plur. opn.).) Reasonableness must be assessed through the likely perspective of counsel at the time. '[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." ' (*Strickland v. Washington* (1984) 466 U.S. 668, 689.)" (*People v. Ochoa* (1998) 19 Cal.4th 353, 445-446, fn. omitted.)

## C.

### *Defense Counsel Pursued a Reasonable Strategy Based on the Evidence*

Even though his trial attorney admitted to the jury that defendant had committed misdemeanor child endangerment, defendant did not receive ineffective assistance of counsel. When there is strong evidence of guilt, as in this case, defense counsel may reasonably conclude the best trial strategy involves concession of some culpability in order to offer the jury some other option favorable to defendant. For example, in *People v. Bolin* (1998) 18 Cal.4th 297, the California Supreme Court noted, "[g]iven the overwhelming evidence of defendant's guilt" concession of guilt as to a lesser offense was a reasonable trial tactic. (*Id.* at p. 334-335.) Moreover, the concession preserved counsel's credibility in later arguing circumstances in mitigation. (*Ibid.*) Elsewhere, the California Supreme Court has noted, " '[g]ood trial tactics demand[] complete candor'

10

with the jury." (*People v. Jackson* (1980) 28 Cal.3d 264, 293, disapproved on another point in *People v. Cromer* (2001) 24 Cal.4th 889, 901, fn. 3.)

With the admission into evidence of defendant's statements to officers that he had seen Rachel hit J. in the head before throwing him to the ground and saw the scratches on J.'s face on the day of the welfare check, defense counsel could reasonably have concluded an acquittal of all charges was unlikely. By conceding the charge of misdemeanor child endangerment, defense counsel preserved her credibility in arguing defendant should be acquitted of felony child endangerment. Defense counsel relied on the videotape to urge the jury to conclude defendant consistently stated he saw only a few scratches on J.'s face.

Moreover, admitting the misdemeanor allowed defense counsel to use the videotaped interview to support her arguments against conviction for being accessory after the fact. Specifically, defense counsel argued the videotaped interview exonerated defendant because he provided Rachel's contact information to the officers. To this end, she urged the jury to conclude the videotape showed defendant "is giving as much information to find Rachel, to get her here, to get her responsible for this situation, as he can."

In short, defense counsel made a reasonable tactical decision to admit culpability for misdemeanor child endangerment so she could rely on an otherwise inculpatory videotape to argue (1) defendant committed no more than misdemeanor child endangerment because he saw only a few scratches on J., and (2) he was sufficiently helpful to the officers to acquit him of being an accessory after the fact. We conclude defendant's trial attorney was not constitutionally ineffective for pursuing a reasonable strategy based on the evidence.

### III

### *Claim of Ineffective Assistance of Counsel for Failure to Move to Exclude the Videotape on Miranda Grounds*

Defendant next contends his trial attorney was ineffective for failure to object to the videotape on grounds it violated his *Miranda* rights. We reject the contention.

As we have noted, a defendant does not receive ineffective assistance of counsel when his or her attorney makes a reasonable tactical decision during trial. (*People v. Ochoa*, *supra*, 19 Cal.4th at pp. 445-446.) The question of whether to object to a particular piece of evidence generally constitutes a tactical decision. (*People v. Hayes* (1990) 52 Cal.3d 577, 621) And, "because trial counsel's tactical decisions are accorded substantial deference [citations], failure to object seldom establishes counsel's incompetence." (*Ibid.*) Thus, we reject a claim of ineffective assistance when the record suggests a reasonable explanation for failure to object. (*People v. Riel*, *supra*, 22 Cal.4th at p. 1185.)

Even if we assume the deputies violated defendant's *Miranda* rights during his interview on the day J. was taken to the hospital, we would nonetheless reject the claim of ineffective assistance of counsel. As we explained in part II C., defense counsel made a reasonable tactical decision not to dispute the contents of the videotaped interview, but rather to rely on the videotape in arguing against conviction of felony child endangerment and being an accessory after the fact. Deputy Benton's testimony at trial redundantly established that J.'s face appeared scratched and connected defendant with J. at the time of the welfare check because both were inside the same home. Thus, if the videotape was excluded, defense counsel would lose the ability to use defendant's statements to argue against conviction on two felony counts (felony child endangerment and being an accessory after the fact). For this reason, we conclude defendant did not receive ineffective assistance of counsel when his trial attorney failed to object that his videotaped interview should be excluded on grounds his *Miranda* rights were violated.

12

DISPOSITION

The judgment is affirmed.


       HOCH    , J.


We concur:


     RAYE   , P. J.


     HULL   , J.